## THE MAIPO.

(District Court, S. D. New York. July 8, 1918.)

1. ADMIRALTY ⬥➡72—PROCEDURE—SUIT AGAINST VESSEL OF FOREIGN GOVERN-
MENT.

The suggestion to an admiralty court that a ship sought to be libeled
is the property and in possession of a foreign government may be made
by the appropriate officer of our government, or by a duly accredited rep-
resentative of the foreign government.

2. INTERNATIONAL LAW ⬥➡10—VESSELS OF FOREIGN GOVERNMENT—IMMUNI-
TY FROM PROCESS.

A naval transport, owned by a foreign government and in its possession,
through a naval captain and crew, although chartered to a private in-
dividual to carry a commercial cargo, is not subject to seizure under
process of an admiralty court of the United States, in a suit by a ship-
per for damage to cargo.

In Admiralty. Suit by the Central Leather Company against the
steamship Maipo. On motion for process against the respondent ves-
sel. Denied.

Charles S. Haight and Wharton Poor, both of New York City, for
the motion.

Roscoe H. Hupper and G. W. P. Whip, both of New York City, op-
posed.

MAYER, District Judge. This is in effect the renewal of an appli-
cation that process be issued against this vessel, the Maipo. The ves-
sel was recently here and ready to sail for another American port, when
libelant sought process against her. It was necessary to decide quick-
ly, and, while denying the motion for reasons outlined in a memoran-
dum, leave was given to move again when the vessel returned here,
so that a fuller consideration could be given to the questions involved.
As the facts, especially in respect of the status of the vessel, are now
quite clear, a brief restatement of the situation is desirable.

The libel is for cargo damages to hides shipped on the Maipo at
Montevideo, Uruguay, to be carried to New York City. The shipper
was the Argentine Central Leather Company, a New Jersey corpora-
tion, but the hides were owned by libelant, a New Jersey corporation,
which is also the assignee of the bill of lading, and the Argentine Cen-
tral Leather Company has assigned all of its rights to libelant. The bill
of lading was of the usual commercial character on a Norton, Lilly &
Co. form, containing familiar provisions setting forth, inter alia, for
what acts and contingencies no liability would accrue. It provided that
it should be signed by the master or agent of the ship, and was, in fact,
signed by Vidal and Sattestin, "Maritime Agents," presumably the
agents of the usual kind for the ship at the shipping port.

[1] As the Chilean Ambassador has recently died, ambassadorial du-
ties are being performed by Senor Varela, the Chilean chargé d'affaires,
and a suggestion has been made by him to the court in the following
form (accompanied by the certificate of the Secretary of State of the

⬥➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

United States accrediting Senor Varela as the Chilean chargé d'affaires):

"Gustavo Munizago Varela, the chargé d'affaires of the republic of Chile in the United States of America, through Burlingham, Veeder, Masten & Feary, proctors appearing specially for the Chilean naval transport Maipo, respectfully suggests to the District Court of the United States for the Southern District of New York that said steamship Maipo at all the times mentioned in the libel was, and now is, owned by the government of the republic of Chile, being a transport in its navy, and in the possession of the government of the republic of Chile in the person of a duly commissioned officer of its navy, the master of said steamship, and wholly manned and operated by a crew employed and paid by said government, which said steamship is to carry back to Chile a cargo belonging to the Chilean government. ＊ ＊ ＊ Wherefore it is respectfully suggested and prayed that said steamship be released from any seizure and declared immune from process.

"Done at the embassy of the republic of Chile, Washington, D. C., July 1, 1918.                    ·G. Munizago Varela, Chilean Chargé d'Affaires."

So much of the suggestion as states that the steamship "is to carry back to Chile a cargo belonging to the Chilean government" will be disregarded, because of the agreement of counsel that no facts occurring after the date when it was arranged that the motion should be adjourned were to be introduced for consideration. The suggestion is not open to question and must be accepted as made. The Parlement Belge, L. R. 5 P. D. 197, 210, 211.

While, in many instances, the suggestion that a ship is the property and in the possession of a foreign government would be made to the court by the appropriate official or department of our own government, I fail to find any support for the proposition that such course is necessary. In re Baiz, 135 U. S. 403, 10 Sup. Ct. 854, 34 L. Ed. 222. It is enough that the fact is presented to the court, as here, by the duly accredited official of the foreign government.

In response to an inquiry from proctors for the libelant and also for another shipper or consignee, our Department of State, through the Third Assistant Secretary, has replied "that the department has no intention of interfering with the legal proceedings to which you refer." I cannot assume that this communication is intended to have any significance. It means, as I read it, nothing more than that the question is one for the courts to dispose of in due course. Doubtless, the Chilean government has not deemed it necessary to bring the matter to the attention of the Department of State, but is willing, without further ado, that the points involved shall be passed upon by the court in orderly procedure without suggestion from our own government.

[2] Libelant contends that the Maipo is subject to process because she, and therefore her sovereign owner, the republic of Chile, is engaged in trade so far as this voyage of the Maipo is concerned, and it is urged that, when a sovereign thus engages in commercial enterprise, he loses his immunity. I shall assume, because of the facts infra, that while, perhaps, the Chilean government is not directly trading, it is in effect using or permitting the vessel to be used for commercial purposes. So far as can be gathered from copies of the translated documents, it appears that the republic of Chile chartered the Maipo to one Sierra, as the result of public bidding. Capt. Soublette of the Chilean navy (the

officer now in command of the Maipo) was authorized to sign the charter party on behalf of his government.

The charter party dated December 1, 1917, was signed by Sierra and Soublette. It provides, among other things, that:

"It is hereby agreed between Mr. Wenceslao Sierra and the captain of the Chilean navy, Mr. Guillermo Soublette, who represents the Treasury Department to charter the naval transport Maipo: * * * No other cargo of any kind will be shipped than that which has been contracted for by the charterers or their agents, except that the Chilean government reserve freight space on the ship which will not exceed 400 tons. * * * The charterers agree * * * to pay * * * to the order of the government representative, Mr. Guillermo Soublette, captain of the navy, for the charter of the transport * * * so much per ton for the return trip to Chile from New York. * * * The Chilean Navy Department will pay all port duties and other taxes assessed on the ship." And finally: "The government representative, captain of the navy is to be considered as the owner and exercise his privileges as such, in so far as the terms of this charter contract are concerned."

From the foregoing, it is apparent that the Chilean government intended that all of the acts of Soublette should be regarded as acts representing and on behalf of his government. It is further plain that the Chilean government intended that at all times this vessel, which it owned, should remain in its possession; and it is not unlikely that this course was taken for the very purpose of keeping the vessel immune in foreign ports. Even though the vessel was chartered by a private person for hire, and that private person contracted for freights for his personal profit, it might be argued with much force that, nevertheless, the vessel was used for a governmental purpose in so far as it enabled Chilean shippers to export their products to the United States and to bring back from here to Chile commodities needed by the people there.

But, laying aside all subsidiary questions, it is desirable squarely to determine whether the vessel is immune because of engagement in commercial enterprise. The view of the American courts, beginning with The Exchange, 7 Cranch, 116, 3 L. Ed. 287, has consistently been in the direction of holding immune the property of a sovereign owned in his sovereign capacity and in his possession.

The precise point here under consideration has not been passed upon by the courts of the United States. The more important cases recently have arisen in tort, although I fail to see any distinction in principle between the wrong complained of, whether it grows out of a breach of contract or is caused by some tortious injury. Long v. The Tampico and The Progresso (D. C.) 16 Fed. 491; The Davis, 10 Wall. 15, 19 L. Ed. 875; The Luigi (D. C.) 230 Fed. 495; The Attualita, 238 Fed. 909, 152 C. C. A. 43; The Pampa (D. C.) 245 Fed. 137. The sole authority for libelant's view is The Charkieh, L. R. 4 A. & E. 59; but that case is no longer recognized by the English courts, having been overruled by The Parlement Belge, L. R. 5 P. D. 197, and having been pointedly disapproved in Mighell v. Sultan of Johore, 1894, 1 Q. B. 149, 154. The succinct statement of Willis, J., in the Court of Appeal justifies [for convenience] this quotation:

"It has been attempted in some cases—in that of The Charkieh, for instance—to say that a sovereign may lose his immunity and privileges by laying down his character as a sovereign and entering into trading transactions

as a private person in another country; and our attention was called to certain dicta (which were not essential to the decision of the case) of Sir Robert Phillimore in The Charkieh as supporting that view. But those dicta were dissented from in the judgment of the Court of Appeal in The Parlement Belge. In the final part of the judgment that court dealt with the very question of the amenability of a foreign sovereign to the process of our courts, and held that one objection, which was fatal to the attempt to bring the sovereign into the admiralty court by means of seizing a vessel, was that, quite independently of the right of the foreign sovereign to have the public property of his state respected, it was contrary to international law and the comity of nations that an independent foreign sovereign should be directly impleaded in the courts of this country. A considerable part of the judgment is devoted to dealing with the case from that point of view. It was said that the process of attachment in the Court of Admiralty by seizing a vessel was an indirect mode of impleading the sovereign, although the sovereign was not personally made a defendant in the action, and that that which could not be done directly could not be done indirectly, and therefore that such a process could not be allowed, on the broad general principle that a reigning sovereign is not subject to the jurisdiction of a foreign country."

From the foregoing it is plain that The Parlement Belge is regarded as authority by the English courts, and it seems to me that the propositions there laid down are peculiarly fitted to present conditions.

Finally, in respect of many other cases cited and arguments presented in explanation of their trend and meaning, it may be said that the sovereign, of course, may make concessions. He may permit suit to be brought against him and erect tribunals for that purpose, such as Courts of Claims.

In dealing with our internal as distinguished from international affairs, our courts have required, not only that the property shall be owned by, but also in the possession of, the United States. The Davis, 10 Wall. 15, 19 L. Ed. 875. But, when ownership and possession are both present, the res is immune, unless otherwise provided by some permissive or concessionary statute. Referring to the charter party to Sierra, the document imposes a number of familiar obligations on the Chilean government, acting through Soublette; but that fact does not change the immune character of the vessel in a foreign port. Sierra may possibly have redress in some Chilean tribunal in the event of breaches of the charter obligations by the Chilean government, very much as a contractor with the United States might sue in the Court of Claims or avail of some remedy granted by statute, if the United States breached its contract.

The final approach—and a proper one—is that which concerns the result and effect of holding such a vessel immune. It is said great loss and inconvenience may be visited upon the many kinds of people who deal with a vessel thus immune, and that American citizens will be put to the trouble and expense for claims, large and small, of seeking their relief in far-distant foreign jurisdictions. The answer is that, when one knows with whom he is dealing and the law applicable, he must arrange accordingly. This may be difficult, but in these days of rapid changes, accommodation to new conditions is accomplished effectively and expeditiously.

While diplomatic questions are beyond the court's province, yet practical considerations of comity are not to be lost sight of. The exigen-

cies and requirements of this extraordinary war may well lead (and possibly already has led) our government to man otherwise commercial ships with American naval officers and men, to the end that our ships may be protected while our needs in various directions may be supplied in foreign ports. These enterprises may, in some instances, be regarded (technically speaking) as commercial, but may, in substance, be of benefit to the people at large. Time is of vital importance to every ship, of whatever nationality, which sails the seas. To be detained by process at this time may cause damage not capable of money measurement. Indeed, it would not be surprising if at no distant date large numbers of vessels setting out from various ports of various countries would be manned as government vessels for the very purpose of assuring quick clearance and freedom from process. Whatever loss or inconvenience, if not safeguarded against, might thus result either to our people when dealing with foreign ships or to foreign peoples when dealing with us, is the price which the individual is paying for the ultimate benefit of his country.

It is not to be presumed, however, that any friendly government, or our own government, will fail to do what is just and fair in connection with operations of a commercial character. Both on authority and in consideration of existing conditions, motion denied.

Since filing my previous memorandum, I have learned from Judge Learned Hand that he decided the same way (without opinion) in a case which by curious coincidence involved the status of a Chilean vessel similarly officered and manned and engaged in commercial enterprise.