James RICH and Walter Precha, Libellants,

v.

NAVIERA VACUBA, S.A., and Republic of Cuba, Respondents.

Nick DARATSAKIS, Intervening Libellant,

v.

NAVIERA VACUBA, S.A., and Republic of Cuba, Respondents.

Julio LOBO, Libellant,

v.

THE M/V BAHIA DE NIPE, her engines, boilers, tackle, apparel and furniture, in rem, and Naviera Vacuba, S.A., a foreign corporation, its Owner and/or Operator, in personam, Respondents.

MAYAN LINES, S.A., Libellant,

v.

REPUBLIC OF CUBA, Principal Respondent,

and

Official Vacuba, and THE S/S BAHIA DE NIPE, her master and/or such other person or persons or agency in possession thereof, Co-Respondents.

UNITED FRUIT SUGAR COMPANY, a Delaware Corporation, Libellant,

v.

5,000 TONS OF SUGAR, in rem, now laden on board THE M/V BAHIA DE NIPE, now in Lynnhaven Roads, Virginia, and Augustin Albella, acting master, in personam, Respondents.

Jorge NAVARRO et al., Libellants,

v.

THE M/S BAHIA DE NIPE, Respondent.

Nos. 8220–8224.

United States District Court
E. D. Virginia,
Norfolk Division.

Aug. 29, 1961.

Sidney H. Kelsey, Norfolk, Va., and Abraham E. Freedman, Philadelphia, Pa., for Libellants in 8220.

Jett, Sykes & Coupland and Waverley L. Berkley III, Norfolk, Va., for Libellants in 8221.

Breeden, Howard & MacMillan, Edw. L. Breeden, Jr., and Robert R. MacMillan, Norfolk, Va., for Libellants in 8222.

Vandeventer, Black, Meredith & Martin and Braden Vandeventer, Jr., Norfolk, Va., for Libellants in 8223.

Parsons, Stant & Parsons and L. S. Parsons, Jr., Norfolk, Va., for Libellants in 8224.

Carl Davis, Asst. Chief, Alan Raywid and James E. Wesner, Attys., Admiralty & Shipping Section, Department of Justice, Washington, D. C., C. V. Spratley, Jr., U. S. Atty., Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., for United States Coast Guard and Attorney General of United States.

WALTER E. HOFFMAN, District Judge.

Of utmost importance to our nation are the inquiries propounded to the Court in these cases which, for the purposes herein stated, have been consolidated. Succinctly stated, they are:

(1) Under what circumstances, if any, may the Executive branch of our government, acting through the United States Coast Guard, prevent the United States Marshal from arresting a foreign-flag vessel and cargo, within the jurisdiction of this court, under a valid process issued by the authority of the United States under the seal of a United States District Court? As a necessary corollary to this inquiry, does such authority exist in 50 U.S.C.A. § 191 upon which the Executive relies?

(2) Irrespective of the determination of the foregoing, is the suggestion of sovereign immunity as filed by the Attorney General of the United States at the request of the Department of State, sufficient to grant immunity as to these actions which seek the arrest of a Cuban vessel and her cargo?

The facts of this controversy are not in material dispute. The Bahia De Nipe, a vessel formerly owned by Naviera Vacuba, S. A., and now apparently operated by Consignataria Mambisas, Division de Lineas De Navegacion Mambisas, Flota Del Estado Cubano, sailed from Cuba with a cargo of sugar on August 8, 1961. Its destination was a port in the Soviet Union. The master and ten crewmen planned to divert the vessel to American waters where they hoped to seek political asylum. Through their efforts they were successful in taking command of the ship when approximately 300 miles East of Bermuda and, on Thursday, August 17, the United States Coast Guard received information to the effect that the Bahia De Nipe was enroute to Hampton Roads, Virginia. The required 24 hour warning was not given. When the vessel reached the three-mile limit, she was met by the Coast Guard and taken to anchorage off Lynnhaven, Virginia. At all other times pertinent to this discussion the Bahia De Nipe has remained within the three-mile limit, and within the jurisdiction of this court.

The Coast Guard boarded the vessel and examined same. Three pistols and approximately 35 hand grenades were located in varying places throughout the ship. A large quantity of literature, consisting of books and pamphlets written in English, Spanish and Russian and political manuals on Cuba and Russia, was scattered about the ship. The weapons and at least a portion of the literature were immediately removed.

From the moment the Coast Guard met the Bahia De Nipe at the three-mile limit, the Cuban vessel has been under the control of the Coast Guard. Immigration officials, customs officers, and Public Health Service authorities were also permitted to board the ship but, aside from this action, no other individual or agent of the United States Government or otherwise has been permitted to go aboard.

On Friday, August 18, a libel was filed in behalf of two longshoremen against Naviera Vacuba, S. A., and the Republic of Cuba, seeking the seizure of the vessel under a clause of foreign attachment. These longshoremen had previously recovered substantial judgments against Naviera Vacuba, S. A., in actions instituted in the United States District Court for the Eastern District of Pennsylvania. In rapid succession additional libels were filed by other claimants; one seeking the recovery of a judgment in the sum of $500,000 rendered against the Republic of Cuba by a state court in Louisiana; another asking for a judgment in the sum of $140,000 for fuel and necessities furnished vessels owned by Naviera Vacuba, S. A., during 1959; a third being a libel against the cargo of sugar which, according to the evidence, originated from the properties of The United Fruit Sugar Company, said properties having been expropriated by the Cuban government in July, 1960; and, finally, an action for wages alleged to be due the master and ten defecting crew members. The Clerk having issued the required processes pursuant to law, the necessary papers were delivered to a Deputy United States Marshal for service upon the ship. A private launch was made available to the Marshal and, in performance of his duties, an effort was made to reach the ship. The Coast Guard cutter Cherokee, after being fully advised as to the purpose of the visit by the Marshal, declined to permit the launch to enter the area [1]. The United States Attorney has stipulated that, but for the physical action of the United

---

[1]. At the time of the adjournment of the court session on Saturday, August 19, 1961, the Marshal again made an effort to effect service in behalf of all libellants who have instituted proceedings in this Court. The effort was unsuccessful for the same reasons previously assigned.

States Coast Guard, the Bahia De Nipe would have been attached by the Marshal under the valid processes issued by this court.

The Coast Guard assigns no reason for its action, other than that it was in accordance with orders, in pursuance of law and for the safety of the Marshal. More specifically, the Coast Guard relies upon 50 U.S.C.A. § 191, which reads as follows:

"Whenever the President by proclamation or Executive order declares a national emergency to exist by reason of actual or threatened war, insurrection, or invasion, or disturbance or threatened disturbance of the international relations of the United States, the Secretary of the Treasury may make, subject to the approval of the President, rules and regulations governing the anchorage and movement of any vessel, foreign or domestic, in the territorial waters of the United States, may inspect such vessel at any time, place guards thereon, and, if necessary in his opinion in order to secure such vessels from damage or injury, or to prevent damage or injury to any harbor or waters of the United States, or to secure the observance of the rights and obligations of the United States, may take, by and with the consent of the President, for such purposes, full possession and control of such vessel and remove therefrom the officers and crew thereof and all other persons not specially authorized by him to go or remain on board thereof.

"Within the territory and waters of the Canal Zone the Governor of the Canal Zone, with the approval of the President, shall exercise all the powers conferred by this section on the Secretary of the Treasury.

"Whenever the President finds that the security of the United States is endangered by reason of actual or threatened war, or invasion, or insurrection, or subversive activity, or of disturbances or threatened disturbances of the international relations of the United States, the President is authorized to institute such measures and issue such rules and regulations—

"(a) to govern the anchorage and movement of any foreign-flag vessels in the territorial waters of the United States, to inspect such vessels at any time, to place guards thereon, and, if necessary in his opinion in order to secure such vessels from damage or injury, or to prevent damage or injury to any harbor or waters of the United States, or to secure the observance of rights and obligations of the United States, may take for such purposes full possession and control of such vessels and remove therefrom the officers and crew thereof, and all other persons not especially authorized by him to go or remain on board thereof;

"(b) to safeguard against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, vessels, harbors, ports, and waterfront facilities in the United States, the Canal Zone, and all territory and water, continental or insular, subject to the jurisdiction of the United States.

"Any appropriation available to any of the Executive Departments shall be available to carry out the provisions of this chapter. June 15, 1917, c. 30, Title II, § 1, 40 Stat. 220; Aug. 9, 1950, c. 656, § 1, 64 Stat. 427; Sept. 26, 1950, c. 1049, § 2(b), 64 Stat. 1038."

The matter was first directed to the attention of this Court on late Friday afternoon, August 18, 1961. After hearing preliminary arguments from proctor for the two longshoremen and the Assistant United States Attorney, the Court issued an order directed to the Captain of the Port and the Commander of the Coast Guard Division Five requiring said parties to appear on Saturday, August 19,

1961, at 10 A.M., to show cause, if any they could, why an order should not be entered permitting the United States Marshal to board the Bahia De Nipe for the purpose of performing his duties as required by law, namely, the attachment of the vessel pursuant to the lawful process issued under the seal of this Court and, parenthetically, a command from the President of the United States [2]. The Court likewise directed the parties involved to keep the Cuban vessel within the jurisdiction of the Court. At the hearing on August 19, the various other libels were consolidated with the initial libel for the purpose of conducting the hearing on the order to show cause.

In advance of this court session, the United States Attorney advised the Court that a communication was forthcoming from the Department of State and, upon the appropriate signature being affixed, the letter would be read to the Court over the telephone. Consent of proctors was obtained to this procedure, with the understanding that the official court reporter would record the conversation and contents of the letter. This was the only communication received by telephone and admitted in evidence without objection. After a delay of more than two hours, the following letter was read to the Court and received in evidence:

"The Secretary of State
 Washington
 August 19, 1961.
"Dear Mr. Attorney General:

"In response to your inquiry to the Department of State concerning the Cuban motor vessel Bahia De Nipe, now at anchor at Norfolk, this is to inform you that it has been determined that the release of this vessel would avoid further disturbance

to our international relations in the premises.

"Sincerely yours,
/s/ Dean Rusk
Dean Rusk
"Honorable Robert F. Kennedy,
Attorney General."

The communicant of this letter to the Court was an Assistant Attorney General in charge of the Civil Division of the Department of Justice. The Court directed his attention to the fact that the letter contained no reference to the necessity of securing "the observance of the rights and obligations of the United States," which is one of the obvious conditions imposed by Congress as a prerequisite for invoking the provisions of 50 U.S.C.A. § 191.

The hearing, not having been concluded by 6 P.M. on Saturday, August 19, was adjourned until Monday, August 21, at 8:30 A.M. An additional communication from the Secretary of State, dated August 20, 1961, to the Attorney General was admitted in evidence, over objections of libellants, reading as follows:

"I understand that the Cuban vessel Bahia De Nipe now at Norfolk is owned by the Government of Cuba and is employed in the carriage for the Government of Cuba of a cargo of sugar which is the property of the Government of Cuba.

"Heretofore, assurances were given by the United States that the vessel would be released in the event that the Government of Cuba declared the vessel to be its property, requested its return, and provided sufficient properly identified personnel to replace those electing to remain in the United States. These conditions have now been fulfilled.

---

2. The oath of the Marshal requires him to "faithfully execute all lawful precepts * * * under the authority of the United States." 28 U.S.C. § 543. His powers and duties are set forth in 28 U.S.C. § 547, commanding him to "execute all lawful writs, process and orders issued

under [the] authority of the United States, and command all necessary assistance to execute his duties." He must give bond for the faithful performance of his duties, and an action for damages lies by reason of any breach of the bond. 28 U.S.C. § 544.

"In the circumstances, it is my opinion that the prompt release of the vessel is necessary to secure the observance of the rights and obligations of the United States."

The contents of the letter from the Secretary of State are fully corroborated by an exchange of telegrams or cables between the Department of State and the American Embassy in Bern, Switzerland; the latter serving as the representative of the United States with respect to relations with Cuba. These telegrams or cables were received in evidence, over objection of libellants, upon the statement of Carl C. Davis, Government attorney, who vouched for the authenticity of same. Other evidence, as revealed by bills of lading, ship's papers, and the testimony of the master who defected, plainly show that the corporation known as "Mambisas Navegacion Lines" is the owner and operator of the vessel. Presumably by reason of the nationalization of Cuba, this corporation is ultimately controlled by the Cuban government.

As the Cuban vessel approached territorial waters, the following message was sent from the Commandant of the Coast Guard, apparently at the request of the Department of State, to the Commander of the Coast Guard Division Five:

"1. On entry U. S. territorial waters board in sufficient force to maintain law and order.

"2. Inform master any member of crew applying for political asylum will, upon finding by Immigration officer that he is a bona fide refugee, be authorized entry into U. S.

"3. Direct vessel to anchor first available anchorage inside Capes for Customs boarding. If required assume control of vessel.

"4. Maintain waterside surveillance.

"5. Foregoing action to be taken under authority 50 U.S.C. 191 and 33 C.F.R. 6.04–5, –7, –8.

"6. Deny access except to U. S. Customs, Immigration, Quarantine, O.N.I., State and F.B.I. officials.

"7. Keep Commandant and *info. addees.* fully informed."

The Commander further testified that, subsequent to the receipt of the aforesaid orders, he was specifically instructed not to permit the Marshal to board the vessel for the purpose of effecting service of the court processes.

The Authority of the Executive to Prohibit the United States Marshal From Performing His Duties.

Acting pursuant to 50 U.S.C.A. § 191, rules and regulations were promulgated and published. Title 33, Code of Federal Regulations, § 6.01–1, et seq. The pertinent provisions are found in § 6.04–1(a) (b), § 6.04–5, and § 6.04–8. For the purposes herein stated, it will be sufficient to refer to § 6.04–5 and § 6.04–8 as the same appear:

"§ 6.04–5. *Preventing access of persons, articles, or things to vessels or waterfront facilities.* The captain of the port may prevent any person, article or thing from boarding or being taken on board any vessel or entering or being taken into any waterfront facility when he deems that the presence of such person, article or thing would be inimical to the purposes set forth in § 6.04–8."

"6.04–8. *Possession and control of vessels.* The captain of the port may supervise and control the movement of any vessel and shall take full or partial possession or control of any vessel or any part thereof, within the territorial waters of the United States under his jurisdiction, whenever it appears to him that such action is necessary in order to secure such vessel from damage or injury, or to prevent damage or injury to any vessel or waterfront facility or waters of the United States, or to secure the observance of rights and obligations of the United States."

Thus it will be seen that the rules and regulations, promulgated under the authority of 50 U.S.C.A. § 191, do nothing more than what Congress has heretofore prescribed. While there are other rules

and regulations issued pursuant to this same statute, they are not of any consequence in this proceeding. Under Executive Order No. 10289, as amended, the Secretary of the Treasury was designated and empowered to perform the rule-making function governing the anchorage and movement of any vessel under 50 U.S.C.A. § 191, 40 Stat. 220.

By Executive Order No. 10173, 15 F.R. 7005, 1950 U.S. Code Congressional Service, Vol. 1, p. 1661, President Truman, on October 20, 1950, after referring to Public Law 679, approved August 9, 1950, which amended § 1, Title II of the Act of June 15, 1917, 40 Stat. 220 (50 U.S.C.A. § 191), said:

> "I hereby find that the security of the United States is endangered by reason of subversive activity, and I hereby prescribe the following regulations relating to the safeguarding against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, of vessels, harbors, ports, and waterfront facilities in the United States, and all territory and water, continental or insular, subject to the jurisdiction of the United States, exclusive of the Canal Zone, and the said regulations shall constitute Part 6, Subchapter A, Chapter I, Title 33 of the Code of Federal Regulations; and all agencies and authorities of the Government of the United States shall, and all state and local authorities * * * are urged to, support, conform to, and assist in the enforcement of these regulations and all supplemental regulations issued pursuant thereto."

The United States Attorney urges that the Captain of the Port has complete authority to take full or partial possession or control of the vessel, whenever it appears to him that such action is necessary in order to (1) secure such vessel from damage or injury, or (2) prevent damage or injury to any vessel or waterfront facility or waters of the United States, or (3) secure the observance of rights and obligations of the United States. With these arguments the Court is in agreement, but the right to prevent access of persons to a vessel under such circumstances is governed by 33 C.F.R. § 6.04-5, in which it is stated that the Captain of the Port may deny such access "when he deems that the presence of such person * * * would be inimical to the purposes set forth in § 6.04-8."

It is an idle gesture to argue that the presence of a Deputy United States Marshal, armed with a process to be served in accordance with General Admiralty Rules 1, 4 and 10, 28 U.S.C., could possibly be inimical to the purposes set forth in 50 U.S.C.A. § 191 or 33 C.F.R. § 6.04-8, unless it falls within the legislative purpose of securing "the observance of the rights and obligations of the United States." The Captain of the Port does not even intimate that the presence of the Marshal would be injurious to the vessel, waterfront facilities or waters. The Commander of the Coast Guard Division Five makes the rather ridiculous statement that the safety of the Marshal was the primary factor, but he concedes that he does not know how the Marshal's safety would be jeopardized. *What he obviously fears is that the Marshal, having made service by effecting a seizure of the vessel and its cargo, will then have precluded an early sailing of the Bahia De Nipe pending hearings on questions of sovereign immunity, requirements relating to the posting of bonds, etc.* The United States Attorney argues that a security risk exists because of the presence of alien crewmen from Cuba. The same problem exists with respect to every foreign-flag vessel, although perhaps to a lesser extent because of the present conditions in Cuba. We are told that the vessel, if arrested by the Marshal, would have to be taken to a dock with the attendant danger of escape on the part of the alien crewmen, or possible danger to the waterfront. The United States Attorney overlooks the fact that, by law and custom, the Marshal invariably designates a "custodian" of the vessel who, in this case, could be the Captain of the Port.

or some other responsible officer of the United States Coast Guard.

 Abundantly clear is the fact that the President has the duty to discharge the responsibilities of the United States in international matters with a view to avoiding difficulties with other governments. If the President is of the opinion that the relations of this country with foreign nations are, or are likely to be, endangered by action deemed by him inconsistent with a due neutrality, it is his right and duty to protect such relations; and in doing so, *in the absence of any statutory restrictions,* he may act through such executive office or department as appears best adapted to effectuate the desired end. 30 Op.Atty.Gen., 291.

The difficulty here presented is that Congress has enacted legislation on the subject. 50 U.S.C.A. § 191. The Constitution undoubtedly grants to the President extensive authority in times of imperative national emergency, especially in the field of international relations. In Little v. Barreme, 1804, 2 Cranch 170, 2 L.Ed. 243, Chief Justice John Marshall discussed the power of the President to instruct the seizure of the Flying Fish, a vessel bound *from* a French port. Congress had previously granted such authority to seize vessels bound or sailing *to* a French port. A unanimous court held that Congress, in providing how the law should be carried into execution, had excluded the seizure of any vessel *not* bound *to* a French port. Thus it follows that in ways short of making laws or disobeying them, the Executive is undoubtedly under a grave constitutional duty to act for the national protection *in situations not covered by the acts of Congress,* and this is so even though his action may not be a direct expression of any particular one of the independent powers which are specifically granted to him by the Constitution.

The legislative history of 50 U.S.C.A. § 191 clearly shows the intent of Congress.[3] The Act of 1917 provided for the seizure of foreign-flag vessels only during a state of national emergency. To provide for protective measures short of the declaration of a national emergency, the 1950 amendment was enacted. A letter from the Deputy Attorney General to the Chairman of the Senate Committee on Interstate and Foreign Commerce states that the purpose of the bill is to safeguard against sabotage or injury of vessels, harbors, ports and water-front facilities and, as stated:

"The provisions of the bill are highly desirable in the light of existing conditions to provide a means whereby the United States may protect vital shipping and shipping facilities from deliberate or accidental injury without the necessity of declaring a national emergency or bringing shipping facilities under military jurisdiction."

While it appears that the national emergency proclamation of 1950 is still in effect,[4] this is of no consequence. Manifestly Congress, having legislated upon the subject, did not intend to cut off an arm of the judiciary under the guise of saying that the exclusion of a United States Marshal from a foreign-flag vessel under the control of the Coast Guard. was "to secure the observance of the rights and obligations of the United States." Indeed, the Secretary of State does not suggest that prohibiting the Marshal from boarding the vessel in performance of his duties constitutes any act securing "the observance of the rights and obligations of the United States." He does state that the Executive has agreed to return the vessel and its cargo to the Cuban government, which act he certifies as necessary "to secure * * * the rights and obligations of the United States," but to frustrate the judicial process by such an extreme interpretation as is now advanced by the Department of Justice would obviously do violence to the Congressional intent.

---

3. U.S.Code Congressional Service 1950, pp. 2954, 2955.

4. Subject to terminal dates respecting men in armed forces. 20 F.R. 173.

This Court does not question the constitutionality of 50 U.S.C.A. § 191. We do not reach this question; nor are we concerned with whether or not the act is being constitutionally applied. There is no statute expressly authorizing the Executive to effectively destroy the judicial process for, without the ability to serve the court process, the doors of the court may be forever closed. Such action on the part of the Executive would be contrary to the expressions in Ex parte Milligan, 4 Wall. 2, 18 L.Ed. 281, wherein President Lincoln attempted to suspend the privilege of *habeas corpus* under certain circumstances and the Supreme Court held that this was a function of Congress. We need only to examine the principles enunciated in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153, to arrive at the conclusion that the Executive has, in prohibiting the Marshal from performing his duty, exceeded his power in the present situation and, quoting the language of the majority opinion of Mr. Justice Black, we find (343 U.S. 589, 72 S.Ct. 867):

"The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice. Such a review would but confirm our holding that this seizure order cannot stand."

■ The foregoing leads to the inevitable conclusion that the Coast Guard, without legal authority, prohibited the United States Marshal from performing his lawful duties. Reliance upon The Maipo, D.C., 252 F. 627, is misplaced. Under the more ancient admiralty practice it was necessary to secure a special order of court before attaching a vessel upon a claim of over $500. The requirement still exists in some jurisdictions. However, in jurisdictions where the admiralty practice is extensive, local rules prescribe that the Clerk is authorized to issue all process without specific order of court. Local Admiralty Rule 1, Eastern District of Virginia. The Maipo, supra, obviously required a motion for process to effect a seizure of the vessel. Such a matter, resting in the discretion of the court, permitted the judicial review of the status of the parties. Without doubt, Congress could provide that no process shall issue to effect the seizure of a foreign-flag vessel unless by order of court, but Congress has not seen fit to prohibit the automatic issuance of such a process upon the filing of a libel and the posting of a stipulation for costs. The Government does *not* contend in argument that the process was not validly issued. Once issued, the law requires that it be served if the *res* is within the jurisdiction of the court.

In our system of law, a dangerous precedent may be established under the urgency of an existing situation. The separation of the three great powers of our government—Executive, Legislative, and Judicial—is essential to the preservation of a democracy. Each has its own powers and duties. The several rights of our respective powers should be zealously safeguarded in upholding these constitutional powers.

### Sovereign Immunity

While there is considerable doubt as to the jurisdiction of the Court to entertain any suggestion of sovereign immunity until the *res* is attached, the Court, after due deliberation, permitted the same to be filed under the authority of The Carlo Poma, 2 Cir., 259 F. 369. The issue in that case arose on a motion staying execution of the process. While the suggestion of sovereign immunity requested that the vessel "be released from any seizure made and declared immune from process," an examination of the case indicates that process had been issued but not executed. Presumably, in 1919, it was necessary to secure an order for process to effect a seizure under the general practice then in existence. The Court, having authority to deny the issuance of process, apparently concluded that it could stay its execution. As a

suggestion of sovereign immunity may be advanced at any stage of the proceedings, this Court has determined that jurisdiction exists to entertain the suggestion even though the *res* has never been arrested by the Marshal. Furthermore, the importance of this issue and the necessity for prompt action constitute impelling reasons why the Court should examine the issue of sovereign immunity at this time. There is, however, authority for the proposition that jurisdiction of the *res* is not obtained until service has been effected or an appearance noted by the respondent. Benedict on Admiralty, 6th Ed., Vol. 2, § 280, p. 336.

There are additional facts which must be considered before setting forth the conclusions as to sovereign immunity. Particular reference is made to the claim of Mayan Line, S. A., in No. 8222. On November 15, 1960, Mayan Line, S. A., filed an action in the Civil District Court for the Parish of Orleans, State of Louisiana, against the Republic of Cuba seeking the recovery of $1,006,550.81, and praying for a writ of attachment against certain personal property on board the vessel Heinrich Schulte, engaged in commercial trade and alleged to be the property of the Republic of Cuba. The basis of the claim was clearly cognizable in admiralty and consisted of (1) unpaid freight, (2) charter hire and expenses, and (3) damages occasioned by reason of a breach of maritime contracts. The writ of attachment was issued according to law, and the property seized by the sheriff. In due time the Republic of Cuba appeared specially through its attorney[5] and filed exceptions to the petition of Mayan Lines, S. A., upon the grounds that (1) consent of the defendant to be sued had not been given, and (2) no jurisdiction existed over a foreign nation and defendant was immune to legal action in the courts of Louisiana. Other proceedings, not pertinent to this case, were had and, on April 10, 1961,

the following order, duly endorsed by the attorney for the Republic of Cuba, was entered:

"Now into Court, through undersigned counsel, comes the Republic of Cuba, made defendant in the above entitled and numbered cause, and on suggesting to the Court that:

"1. Defendant desires to dismiss its exception to the jurisdiction of this Honorable Court *ratione materiae* and *ratione personae,* and its exception to the jurisdiction of this Honorable Court that it is a foreign nation which is immune to legal action against it in the courts of Louisiana;

"2. That Defendant desires to dismiss the aforesaid exceptions with prejudice:

"It Is Ordered that the exceptions of the Defendant, Republic of Cuba, to the jurisdiction of this Court *ratione materiae* and *ratione personae,* and the exception that the Defendant, Republic of Cuba, is a foreign nation, immune to legal action against it in the State of Louisiana, be and the same are hereby dismissed with prejudice."

Contemporaneously with the entry of the aforesaid order, the Republic of Cuba, through its same attorney, filed an answer to the petition of Mayan Lines, S. A. At the same time a stipulation was presented to the court, from which it appears that the parties had agreed to compromise the claim of Mayan Lines, S. A., for the sum of $500,000, and agreed to a judgment in this amount, plus interest. The following portions of the stipulation are pertinent:

"Republic of Cuba hereby acknowledges and admits that the Civil District Court, State of Louisiana, Parish of Orleans, has jurisdiction to render judgment against the Republic of Cuba in these proceedings and *waives any and all rights*

---

5. The name of the attorney is intentionally omitted from this opinion. Although not in the record a recognized legal directory lists his estimate of legal ability as "high" and a recommendation of "very high."

*of sovereign immunity which it may now or hereafter be entitled to plead.* Republic of Cuba acknowledges, admits and declares that the judgment herein provided for shall be a valid, legal and binding judgment against the Republic of Cuba, enforceable in the courts of the United States or of any other country and executory against any and all property, goods and chattels of the Republic of Cuba, and whether located within or without the United States. *With respect to the enforcement and execution of said judgment, Republic of Cuba hereby specially and specifically waives the provisions, exemptions or immunities which it may be entitled to plead as a bar in the enforcement and execution of this judgment* under and by virtue of the laws of the United States or of any other country, and declares that full faith and credit shall be given said judgment under the laws of any country wherein execution or enforcement may be sought." (Emphasis supplied.)

Pursuant to the foregoing stipulation a judgment was entered on April 12, 1961, in the sum of $500,000, plus interest at the rate of 5% per annum from judicial demand until paid.

Upon the presentation of these facts and the suggestion by government counsel that, according to information they had received from Washington, the attorney appearing for the Republic of Cuba had no authority to enter into the stipulation waiving sovereign immunity and confessing judgment, the Court invited evidence on the subject of the attorney's authority, to be presented either in this court or the Louisiana court. Counsel for the government elected not to present such evidence, but declined to stipulate that the attorney had such authority. Counsel for Mayan Lines, S. A., relying upon the full faith and credit clause of the Constitution, art. 4, § 1, stated that no evidence was necessary, but stood ready to refute any evidence submitted by the government. The government insists that no attorney may waive, or enter into an agreement to waive, the immunity of a foreign nation, and that such waiver must be in the form of a written document duly executed by an authorized representative of a foreign nation, which said written document must appear of record in the judicial proceedings. It is not sufficient, the government insists, merely to retain such a document in the attorney's file, or otherwise be verbally authorized by the head of a foreign nation to act in behalf of said nation.

Under the circumstances hereinabove related, the Court finds as a fact that the attorney representing the Republic of Cuba in the Louisiana proceeding had full and complete authority to execute the stipulation, waive the sovereign immunity, and confess judgment in behalf of his client. There remains, of course, the legal contention advanced by counsel for the government, as the Louisiana record does not affirmatively reflect the presence of any written document executed by an accredited official of the Republic of Cuba.

The right of sovereign immunity was officially requested by the Revolutionary Government of Cuba, by Foreign Minister Roa, through the Swiss Embassy, at 8:30 P.M. on August 20, 1961. As the certified copy of the stipulation and judgment from the Louisiana court was received in evidence in this Court on the same day, the Cuban request for sovereign immunity certainly cannot be considered a *specific* repudiation of any waiver of immunity previously authorized. The request for recognition of sovereign immunity does *specifically* refer to the Bahia De Nipe and its cargo. There is no intimation that the Department of State made reference to the nature of the claims asserted by these libellants, especially the Mayan Lines claim with its attendant complications involving an unconditional waiver of immunity; nor does the Department of State indicate that it proposes to settle the existing claims against the vessel by diplomatic negotiations between the

United States and Cuba. Ex parte Republic of Peru, 318 U.S. 578, 587, 63 S.Ct. 793, 87 L.Ed. 1014.

The unanswered question in Ex parte Republic of Peru, supra, is now essentially before this court. At the conclusion of the majority opinion by Chief Justice Stone, it is said (318 U.S. 589. 590, 63 S.Ct. 800):

> "We have no occasion to decide whether the court should surrender the vessel and dismiss the suit on certification of sovereign immunity by the Secretary, made after the friendly sovereign has once unqualifiedly assented to a judicial determination of the controversy."

If the waiver of sovereign immunity by the Republic of Cuba in the Louisiana proceedings is complete, and if the same applies to any attempt to enforce collection of said compromise judgment, we do not then reach the suggestion of sovereign immunity made by the Attorney General in the instant litigation.

By the actions of Cuba in the Louisiana proceedings in invoking the aid of that state court, the rights of Mayan Lines, S. A., have been substantially diminished. The claim, by agreement, has been reduced from $1,006,550.81 to $500,000. The claimant, Mayan Lines, S. A., is forever precluded from recovering in excess of the agreed amount of the state court judgment. While not precisely in point, it would appear that the principles enunciated in People of Porto Rico v. Ramos, 232 U.S. 627, 34 S.Ct. 461, 462, 58 L.Ed. 763, are somewhat appropriate [6] wherein the court said:

> " * * * [T]he immunity of sovereignty from suit without its consent cannot be carried so far as to permit it to reverse the action invoked by it, and to come in and go out of court at its will, the other party having no right of resistance to either step."

It is recognized that in People of Porto Rico v. Ramos, supra, only one action was before the court whereas, in the pending litigation, we must consider the overall effect of two proceedings, and the action of Cuba in invoking the assistance of the state court to effect a compromise judgment.

The government relies upon Beers for Use of Platenius v. State of Arkansas, 20 How. 527, 529, 61 U.S. 527, 529, 15 L.Ed. 991, where the statement is made:

> "And as this permission [consent to be sued] is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it."

Arkansas, by an act approved subsequent to the institution of the legal proceedings, prescribed certain requirements or conditions as a prerequisite to the waiver of the privilege of sovereign immunity. The court pointed out that the law, prior to the enactment of the special legislation, did not constitute a contract, and contained no stipulation that these regulations should not be modified thereafter to protect the public interest. The distinction in this case is, as previously noted, that Cuba, as to the Louisiana proceedings, has waived its immunity to the extent of the enforcement and collection of the agreed judgment.

■ It is, of course, clear that a mere contract between a nation and an individual is only binding on the conscience of the sovereign and has no pretensions to compulsive force. It confers no right of action independent of the sovereign will. Principality of Monaco v. State of Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282; Lynch v. United States, 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434.

■ With reference to the government's contention that Cuba's waiver of

6. The now Mr. Justice Frankfurter appeared as counsel for the People of Porto Rico in the cited case.

immunity in the Louisiana court must be supported by documentary evidence affirmatively appearing in the court record, we do not believe that the authorities support this view in matters in which reputable attorneys have appeared in behalf of the sovereign. In The Sao Vicente, 3 Cir., 295 F. 829, the court pointed out that the orderly way for a foreign government to consent to suit and submit to jurisdiction was by the voluntary act of entering a general appearance which, under practice in the courts of this country, must be through an attorney. To the same effect is Ervin v. Quintanilla, 5 Cir., 99 F.2d 935, certiorari denied 306 U.S. 635, 59 S.Ct. 485, 83 L.Ed. 1037. Disagreeing with the government that the Louisiana judgment is defective on its face, in that the affirmative documentary evidence of the attorney's authority to waive the sovereign immunity is required, the Court holds that the Louisiana judgment is entitled to full faith and credit.

We turn to the crucial point. Was the waiver of immunity of such a continuing nature that it cannot be repudiated as to a special item of personal property sought to be seized under attachment? As much as it may be regretted that Cuba may, and undoubtedly will, escape the payment of a valid judgment, the case of Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen, 2 Cir., 43 F.2d 705, appears to foreclose the right of Mayan Lines, S. A., to prevail in its efforts to effectively attach the Bahia De Nipe. In Dexter & Carpenter, the action was filed by the Swedish State Railways claiming a breach of contract for the sale of coal. Defendant answered and counterclaimed alleging a like breach of contract. A New York bank was named as a party defendant as there were funds on deposit to cover the coal purchased by the Swedish State Railways. In the first trial, the complaint was dismissed and a verdict and judgment rendered in favor of Dexter & Carpenter. On appeal by both parties, the judgment dismissing the complaint was affirmed, but the judgment in favor of Dexter & Carpenter was re-

versed for an error in the court's charge. Certiorari was denied, 275 U.S. 497, 48 S.Ct. 121, 72 L.Ed. 392. On the second trial a judgment was rendered for Dexter & Carpenter in the sum of $411,203.72 which, on appeal, was affirmed. 32 F.2d 195. On application for reargument a certificate, executed by the Swedish Minister, advancing the claim of immunity was filed and reargument denied. A like suggestion was presented to the Supreme Court on certiorari and was denied. 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629. Subsequent to final judgment, the Swedish government sought to intervene, appearing specially, seeking immunity. All parties conceded that the Swedish State Railways, against whom the judgment had been rendered, and the Swedish government were one and the same. After discussing the general rule that process subsequent to judgment is an essential part of every judgment, the court, in considering the application of this rule to an execution against the sovereign power's property within the jurisdiction of the court, had this to say (43 F.2d 708):

"But the question presented is whether execution may issue on this judgment against this sovereign power's property because the court acquired jurisdiction by expressed or implied consent. And does the jurisdiction of the court continue in effect until its judgment is satisfied even against this sovereign power, though a plea of immunity is interposed against such execution?

\* \* \* \* \* \*

"But consenting to be sued does not give consent to a seizure or attachment of the property of a sovereign government. The clear weight of authority in this country, as well as that of England and Continental Europe, is against all seizures, even though a valid judgment has been entered. To so hold is not depriving our own courts of any attribute of jurisdiction. It is but recognizing the general international understanding, recognized by civilized nations, that a sovereign's person and

property ought to be held free from seizure or molestation at all peaceful times and under all circumstances. Nor is this in derogation of the dignity owed to our courts."

■ The Dexter & Carpenter case contains an interesting discussion of the point at issue. It would serve no useful purpose to extend this opinion by quoting at length from the decision. While it has been argued by Mayan Lines that there is a clear distinction in that the waiver of immunity in Louisiana was specifically stated to be a continuing one applicable to all properties of Cuba found within the jurisdiction of any country, the law apparently authorizes a repudiation no matter how distasteful it may be. To the extent of the Bahia De Nipe and her cargo, there has been a repudiation by Cuba in the form of the claim for sovereign immunity. Cuba has breached its contractual agreement not to plead immunity in the enforcement of the judgment, but the law suggests that this may be done. There need not be an express repudiation of the Louisiana waiver. It may be limited to the assets sought to be attached. No precise form of words is necessary to constitute an absolute and unequivocal repudiation as to the vessel and cargo. The claim of sovereign immunity is a denial of the existence as to any agreement to permit the seizure of the vessel and cargo and is equivalent to a repudiation or renunciation of liability as to these assets.

For the reasons set forth above, it becomes unnecessary to determine whether the maritime nature of the claim of Mayan Lines lost its original identity when it was reduced to judgment in the state court of Louisiana, and, therefore, a writ of attachment will not lie. No authority touching upon the subject has been presented. Whether the state court judgment constitutes a complete novation, thus destroying what was originally cognizable in admiralty, is apparently unanswered. See Fox v. Patton, D.C., 22 F. 746. Cf. Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239.

Mayan Lines relies heavily upon National City Bank v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389, in which the Supreme Court held that where a foreign sovereign institutes an action in our courts, it is not immune from a counterclaim limited to reducing the sovereign's recovery, even though the counterclaim is not based on the subject matter of the sovereign's suit and does not grow out of the same transaction. While the considerations of "fair play" were the controlling factors in the Republic of China case, it can hardly be said that Cuba, when it appeared in the Louisiana proceeding, was the party originally invoking the jurisdiction of that court. The limited scope in Republic of China does not permit the expansion of the "fair play" doctrine in the absence of more implicit approval of our highest court.

We reach, at last, the contentions of the remaining libellants and, to this extent as well, the further contention of Mayan Lines. In summary, the arguments are:

(1) Cuba is not a "friendly" nation.

(2) The court may inquire into matters of ownership, title and possession irrespective of the views of the Department of State.

(3) The Bahia De Nipe was engaged in commercial trade and, therefore, not a proper subject of claim of immunity.

(4) The suggestion of sovereign immunity is imperfect on its face, and lacks the required findings by the Department of State.

(5) The letter from the Acting Legal Advisor of the Department of State, which contained the request for invocation of sovereign immunity, was not that of a proper representative of the State Department.

(6) The Court may, in determining whether immunity should be granted, consider the present and past policies of the Department of State.

■ The facts presented herein demonstrate a classic case of barratry. Whatever we may think of the owners

or operators of the vessel, the acts of the master and ten defecting crewmen constituted barratry. National Union Fire Ins. Co. of Pittsburgh v. Republic of China, 4 Cir., 254 F.2d 177. Assuming arguendo the original possession and ownership by the Republic of Cuba, that possession and ownership was not lost by the rebellion of the crew and the diversion of the vessel's voyage. Once again the question is without precedent in situations presenting the issue of sovereign immunity, but there is support for the proposition that courts do not enforce customs duties, taxes, etc., where a vessel is brought within the jurisdiction by an act of piracy. The Louise F., D.C. S.D.Fla., 293 F. 933. There are even more cogent reasons in not declaring a loss of ownership and possession in cases touching upon sovereign immunity which are so vital to our international relations. The Court is in complete agreement with the government in saying that the possession by the Coast Guard, as of the time of filing the libels herein, was that of protective custody for the Republic of Cuba which, incidentally, is an additional reason why the provisions of 50 U.S.C.A. § 191 do not apply to prevent the Marshal from serving the court process.

■ The United Fruit Sugar Company has presented evidence which supports its argument that the cargo emanated from its properties which were expropriated by the Revolutionary Government of Cuba in July, 1960. The Department of State has, indirectly at least, accepted Cuba's statement that the vessel and cargo belong to the Cuban government. It is conceded that United Fruit Sugar Company had valuable properties taken from it by the expropriation decree and, of course, no compensation has been paid for such taking. Under our system of laws, the Court would, if permitted to do so, find that the title to the cargo of sugar remains in The United Fruit Sugar Company. Unfortunately this is not sufficient as the decided cases tend to the view that vessels and cargo expropriated by, and in possession of, a foreign sovereign are immune from suit upon a suggestion of immunity. Ervin v. Quintanilla, supra; The Navemar, 2 Cir., 102 F.2d 444, supplemental opinion 103 F.2d 783; Yokohama Specie Bank, Ltd. v. Chengting T. Wang, 9 Cir., 113 F.2d 329, certiorari denied 311 U.S. 690, 61 S.Ct. 71, 85 L.Ed. 446.

■ It is vigorously urged by all libellants that the Department of State has taken inconsistent positions in recognizing Cuba's claim of sovereign immunity as to the vessel and cargo. They point to the protests of the Department of State immediately following the expropriation decree of July, 1960. They argue that the famous Tate letter of 1952 established a policy which is not now being followed. The short answer to these contentions is that no policy with respect to international relations is so fixed that it cannot be varied in the wisdom of the Executive. Flexibility, not uniformity, must be the controlling factor in times of strained international relations.

■ Just as the Executive is not permitted, under the separation of powers, to interfere with the Judiciary, so also the Judiciary should avoid any conflict with the Executive in the field of international relations. The President, as the elected representative of the people of the United States, is the final word on the subject in the absence of Congressional legislation. It is not for a court to question such matters of policy, the reasons for action taken in specific cases, the alleged inconsistent positions asserted and the "findings" of the Executive.

■ The foregoing brief statement disposes of such questions as the status of Cuba as a "friendly" nation, the fact that the Bahia De Nipe was engaged in commercial trade, and the present and past policies of the Department of State. Under like reasoning the letter to the Attorney General from the Acting Legal Advisor of the Department of State requesting the invocation of sovereign immunity in behalf of Cuba is not subject to question by the court. The Attorney General, acting on the faith of said letter, has seen fit to suggest the immunity.

Congress has not specifically prescribed any particular requirements to be met for the Attorney General to invoke the immunity. The Attorney General of the United States has accepted the request as transmitted by the Acting Legal Advisor of the Department of State. In his view, and in the eyes of this Court, the request is with the full authority of the State Department, the Secretary of State, and in the final analysis, the President of the United States.

The suggestion of immunity does not, we are told, meet the required test of "findings" as to ownership and possession. It is argued that these findings are essential to the granting of sovereign immunity. While there is authority to the contrary as evidenced by lower court decisions [7], an examination of the opinions of the United States Supreme Court will reveal only one decision in which the recommendation of the State Deparment was disregarded. In Berizzi Bros. Co. v. The Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088, the Executive declined to suggest sovereign immunity, but the court nevertheless granted same. In no case decided by the highest court of our nation has the suggestion of immunity been discarded. The language in Ex parte Republic of Peru, 318 U.S. 578, 588, 63 S.Ct. 793, 87 L.Ed. 1014, is so persuasive that this court arrives at the conclusion that the recognition and allowance of the claim of sovereign immunity by the State Department, when accompanied by a certification of its action presented to the court by the Attorney General, is final and binding upon the court. As Chief Justice Stone said (318 U.S. 588, 63 S.Ct. 799):

"That principle is that courts may not so exercise their jurisdiction, by the seizure and detention of the property of a friendly sovereign, as to embarass the executive arm of the government in conducting foreign relations. 'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction'. United States v. Lee, 106 U.S. 196, 209 [1 S.Ct. 240, 251, 27 L.Ed. 171]. More specifically, the judicial seizure of the vessel of a friendly foreign state is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination that the vessel is immune. When such a seizure occurs the friendly foreign sovereign may present its claim of immunity by appearance in the suit and by way of defense to the libel. Compania Espanola v. The Navemar, supra, [303 U.S.] 74 [58 S.Ct. 434, 82 L.Ed. 667] and cases cited; Ex parte Muir, supra [254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383]. But it may also present its claim to the Department of State, the political arm of the Government charged with the conduct of our foreign affairs. Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations. Compania Espanola v. The Navemar, supra, [303 U.S.] 74, [58 S.Ct. 434, 82 L.Ed. 667]; The Exchange, 7 Cranch 116 [3 L.Ed. 287]. This practice is founded upon the policy, recognized both by the Department of State and the courts, that our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings."

7. The Katingo Hadjipatera, D.C.S.D.N.Y., 40 F.Supp. 546, decided prior to Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014, and Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729.

If we are to follow the teachings of Ex parte Republic of Peru, supra, and Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729, whenever a claim of sovereign immunity is recognized and allowed by the Department of State, the courts are no longer permitted to inquire into the sufficiency of the suggestion. While the certification by the State Department leaves much to be desired, and adopts qualifying language with respect to ownership of the vessel and cargo [8], the acceptance of these facts as true is conclusive upon the court and shifts the responsibility to the Department of State and Attorney General.

That there is a definite split of authority on the right of the court to determine such matters is admitted. Interesting discussions are to be found in the annotation appearing in 99 L.Ed. 403–425, and in an editorial comment in 47 American Journal of International Law, pp. 93–106. The conclusion of this Court is predicated upon what the Court believes to be the principles set forth by the United States Supreme Court.

▆▆ In one final word we must recognize that rapidly changing events in the world of today compel the Executive to take action involving international affairs which, in the eyes of the public, may seem a bit strange. However that may be, while the doctrine of sovereign immunity may, in a particular case, operate to the benefit of the foreign sovereign, the invocation of such a doctrine is undoubtedly of great concern to our own country. Since the President, in his wisdom, has seen fit to recognize and allow the claim of Cuba, it is the duty of this Court to give judicial support to that decision.

An order will be entered in accordance with this memorandum.[9] The order should incorporate the ruling of the Court on the applicability of 50 U.S.C.A. § 191 and the granting of sovereign immunity. As the matter will be heard by the Court of Appeals for the Fourth Circuit on Tuesday, September 5, 1961, the order will be stayed pending action by the Court of Appeals and, in the interim period, the Bahia De Nipe and her cargo shall remain within the jurisdiction of this Court, unless otherwise ordered by an appellate court. In the event certiorari is sought by any party in interest, the matter of a further stay will rest with the Court of Appeals or United States Supreme Court.

---

8. The Secretary of State uses the term "I understand" when stating that the ownership is in the Republic of Cuba.

9. The urgency of an immediate decision sion of the interesting legal questions precludes a more comprehensive discusraised in this case.